COMMONWEALTH vs. DENISE M. GALLISON.

Middlesex. February 3, 1981. — June 3, 1981.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS, & ABRAMS, JJ.

*Homicide. Assault and Battery. Practice, Criminal, Instructions to jury, Verdict, Severance. Evidence, Relevancy and materiality, Other offense.*

At the trial of a defendant charged with manslaughter in connection with the death of her two year old daughter, there was sufficient evidence to warrant a finding of guilty beyond a reasonable doubt either on the theory that she had made no effort to obtain medical help for the child even though she knew the child was gravely ill or on the theory that the child's death had resulted from the defendant's beating her. [665-667]

At the trial of a defendant charged with assault and battery by means of a dangerous weapon on her three year old son, there was sufficient evidence to warrant a finding beyond a reasonable doubt either that the defendant had applied a lighted cigarette to the boy's buttocks or that she had engaged in a joint venture with her husband who had inflicted the burns on the victim. [667-668]

There was no merit to a defendant's claim that the judge's charge with respect to manslaughter permitted a conviction merely on a finding of mistake, negligence, or inadvertence. [668-669]

At the trial of a defendant charged with manslaughter in connection with the death of her two year old daughter, the judge's explanation, in response to a jury question, that manslaughter might be found "if the defendant intentionally or recklessly and wantonly failed to provide proper necessary care, and, as a result of that, the child died" was not prejudicial to the defendant. [669-670]

There was no merit to a defendant's claim that the judge's instructions on alternate theories of manslaughter permitted the jury to return a nonunanimous verdict. [670-671]

At the trial of a defendant charged with manslaughter in connection with the death of her two year old daughter and with assault and battery by means of a dangerous weapon on her three year old son, the judge did not err in refusing to sever the charges where the evidence as to the defendant's physical abuse of her son would have been admissible in a separate manslaughter trial as relevant to the defendant's state

of mind at the time of her daughter's death and as relevant to show a common course of conduct regarding the two children. [671-674]

INDICTMENTS found and returned in the Superior Court on June 9, 1978.

Motions to sever were denied by *Sullivan*, J., and the cases were tried before *Garrity*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Patricia A. O'Neill* for the defendant.

*Robert M. Raciti*, Assistant District Attorney, for the Commonwealth.

LIACOS, J. The defendant was convicted on December 18, 1978, of manslaughter, G. L. c. 265, § 13, for the death of her two year old daughter, Jennifer, and of assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A, upon her three year old son, Edward. The defendant was also convicted of assault and battery on Edward, G. L. c. 265, § 13A, and on two counts for failure to provide care for a minor, G. L. c. 273, § 1. She received a sentence of not more than twenty nor less than eighteen years at the Massachusetts Correctional Institution, Framingham (MCI), on the manslaughter conviction, and a nine- to ten-year concurrent sentence on the conviction of assault and battery by means of a dangerous weapon.[1] The convictions for assault and battery and failure to provide care for a minor resulted in concurrent sentences of two years in MCI, to be suspended for two years, but to go into effect from and after any sentence then being served or waiting to be served. She appeals from these convictions, pursuant to G. L. c. 278, §§ 33A-33G.[2]

The defendant claims her motion for directed verdicts as to the indictments charging manslaughter and assault by

[1] On appeal to the Appellate Division, G. L. c. 278, §§ 28A-28C, these sentences were modified to not more than ten nor less than seven years.

[2] The convictions for unlawful disposal of a human body and failure to report death were filed, without objection, and hence are not before us. *Commonwealth* v. *Delgado*, 367 Mass. 432, 438 (1975).

means of a dangerous weapon was improperly denied. She argues also that the judge's charge erroneously defined manslaughter, and that his instructions to the jury improperly permitted a nonunanimous verdict. Last, she claims that failure to allow a motion to sever the indictments pertaining to Edward from those pertaining to Jennifer denied her a fair trial. We conclude that there was no error.

The Commonwealth presented evidence of the following facts. The son, Edward Gallison, Jr., was born in November, 1974. The daughter, Jennifer, was born in September, 1975. The Department of Public Welfare brought a petition for care and protection of Edward in October, 1975. Both children were eventually placed in foster homes. Jennifer was returned to the defendant's physical custody in July, 1977. Edward was returned to the defendant's physical custody in September, 1977. Edward was in good health and had no bruises or mouth damage at that time. On May 12, 1978, police officers and welfare department workers who entered the Gallison apartment found Edward alone in the apartment and bruised "from head to toe." Photographs taken that day evinced numerous bruises about the boy's body, missing front teeth and upper lip, as well as two small scars, one on each buttock, apparently caused by a lighted cigarette.

Several Commonwealth witnesses recounted the defendant's abusive treatment of Edward. One Timothy Mullins, a fellow worker of the defendant's husband, described seeing Edward when he visited the Gallisons during January and February, 1978. On one occasion he found Edward standing still as punishment in the middle of the parlor. During a later visit Mullins again observed the boy similarly standing in the parlor, this time wearing a pair of his soiled underpants over his head. The defendant explained to Mullins that she was toilet training Edward. Mullins described a third instance of seeing the defendant give Edward a "little slap" on the back of the head saying, "Get in, you little bastard," as he entered Mullins's car. Mullins had observed the deformed condition of Edward's mouth during his visits but assumed it was due to a harelip.

The Gallisons' downstairs neighbor, Mary Brown, testified that, over the period from September, 1977, to May, 1978, she heard daily sounds of "hollering" and "spanking" during the hours the defendant's husband was at work. The witness heard the defendant yelling around the noon hour, "I will kill you if you don't eat." The neighbor also related that one day in early May, 1978, the defendant asked to have a cigarette and came into the neighbor's apartment for coffee. The two had coffee together each day of that week, and on one of those visits Edward accompanied his mother. The witness observed that his lip "[h]ad like a piece missing" and his face had scars and black eyes.

Police and social workers removed Edward from the apartment on May 12, 1978. He was taken to Cambridge City Hospital. Dr. Porter, the physician who examined Edward after his admission to the hospital on May 12, 1978, described him as "[a] small boy, fearful. He was covered with multiple bruises, black and blue marks over his body. Strikingly, was the finding that his upper lip was gone." The lip had been obliterated by repeated forceful blows. The doctor opined that Edward's teeth were missing as a result of blows to the mouth. Dr. Porter described Edward's buttocks as leathery, as if "struck a multiple number of times" by an object other than a hand. He further testified that two small scars which he found on each of Edward's buttocks resulted from cigarette burns inflicted perhaps two weeks earlier. Although he was three and one-half years of age at the time, his size was at the fiftieth percentile of a child two and one half years of age. Noting that Edward had been born prematurely, the doctor characterized premature birth as a risk factor for abuse, but declined to state that abuse might focus on one child and not another.

When the police and social workers entered the defendant's apartment on May 12, 1978, Jennifer could not be found. They were told by the defendant's husband that Jennifer was in Texas with his parents. After further investigation, the police returned to the defendant's apartment on May 14, 1978, and placed her under arrest for manslaughter and for concealing Jennifer's body.

The Commonwealth's case as to the death of Jennifer consisted primarily of two statements which the defendant made to the Somerville police on the day of her arrest. The statements were not consistent, but she indicated Jennifer became ill in February, 1978. Jennifer was vomiting continuously and had diarrhea; her temperature on February 5 was 100°F. She described the worsening of Jennifer's illness on February 6, 1978, the day of an historically severe blizzard. The defendant said she thought the child had pneumonia when her fever rose from 101°F to 105°F by late afternoon. Jennifer continued to suffer from diarrhea and vomiting and began to shake and shiver. The apartment was unheated because of lack of oil. The defendant brought Jennifer into the kitchen, which was the warmest room. The child collapsed, fell face down, and hit her head against a wooden kitchen chair.[3] The defendant stated that the child did not cry, but was "like she was in a deep sleep." The child wasn't breathing, but the defendant found a heartbeat and attempted resuscitation. She made no calls to neighbors, doctors, or police to seek assistance. She asked her husband to help her when he came back from the store, but their efforts were futile and the child "just went." The defendant's husband laid the baby in her cot overnight. They found Jennifer "ice-cold" the next morning. The defendant and her husband then moved Jennifer's body to the back room, the coldest room in the apartment. The defendant stated that she opened the window and "blocked that room off." Jennifer's body remained in the back room for six weeks[4] until the defendant's husband put it into a large trash bag and placed it into a trash container on a nearby

---

[3] There was some discrepancy in the defendant's accounts of Jennifer's fall. In one version the child collapsed on the kitchen floor, not breathing. In still another interview, she related that Jennifer struck her head on a coffee table. The version recounted in the text was given during the defendant's last statement to the Somerville police.

[4] The defendant also told the Somerville police that at one point a week or two after Jennifer's death the defendant's husband attempted to bury the body but was unsuccessful in digging a grave because the ground was too hard.

street. The defendant and her husband agreed to say only that Jennifer was away with her grandmother.

Also in her statements to the police was the defendant's account that she administered liquid aspirin to Jennifer and fed her pieces of bread to relieve the vomiting and diarrhea. She claimed she used a neighbor's phone to call Somerville Hospital when Jennifer's illness became acute on February 6, but was refused an ambulance because of the storm. The downstairs neighbor Mary Brown, whose phone the defendant had used previously, denied that the defendant had sought use of her phone at all on the evening of February 6. Employees working the Somerville Hospital emergency switchboard during the late afternoon and evening of February 6, testified that no callers were denied ambulance service because of the storm that day. One of the owners of the ambulance service covering Somerville Hospital on February 6 testified that she logged no request for an ambulance to the defendant's address.

There was no direct evidence of the condition of Jennifer's body or of the cause of death. The body was never recovered, probably having been incinerated in the regular course of rubbish disposal. The defendant stated that she had not taken Jennifer to a doctor because the clinic would not give shots without prior medical records. She denied ever beating or needing to discipline Jennifer. The only evidence of bruises on Jennifer came from the social worker, Carolyn Punch, who observed a circular bruise, a thumbprint, on Jennifer's left cheek during a home visit in September, 1977. The defendant explained to the social worker that she had inflicted the bruise inadvertently.

There was testimony that the defendant's apartment was cluttered and dirty, with empty cans, beer cans, and dishes on the kitchen table. Witnesses attested to a distinct, unpleasant odor in the apartment. Dog urine and feces littered the floor.

The defendant did not testify. Two witnesses called by the defense proffered testimony that Edward's mouth deformity resulted from dental surgery and that parental abuse might target on only one of several children.

We turn now to the various claims of error.

1. *The Motion for Directed Verdicts.*

a. *Manslaughter.* The elements of manslaughter are set forth in *Commonwealth* v. *Welansky,* 316 Mass. 383, 399 (1944). "The essence of wanton or reckless conduct is intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another." The defendant argues that under this test the Commonwealth failed to adduce sufficient evidence of the essential elements of manslaughter to warrant submission of this case to the jury. She maintains that the evidence, derived primarily from her own statements, portrays a woman acting under difficult conditions to nurse her child through a serious illness. The defendant urges that her omission to obtain medical care can be viewed only as a good-faith mistake of judgment falling far short of the intentional, wanton or reckless "omission where there is a duty to act" contemplated by *Welansky, supra* at 399. Also, she asserts a total lack of competent evidence of manslaughter to support the charge that she had physically beaten Jennifer. Finally, the defendant maintains that the Commonwealth failed to show that her conduct in fact caused Jennifer's death.

Exercising our obligation to review the evidence in the light most favorable to the Commonwealth, *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-677 (1979), we conclude on this record that there was ample evidence to permit the jury to deliberate the manslaughter charge. As a parent to Jennifer, the defendant had a duty to provide for the care and welfare of her child. *Commonwealth* v. *Hall,* 322 Mass. 523 (1948). See generally *Custody of a Minor (No. 3),* 378 Mass. 732, 744 (1979), and cases cited therein. From her own account the jury might have believed that she made no effort to obtain medical help, knowing that her child was gravely ill. The jury were free to disbelieve her claimed attempts to call for an ambulance and to give credence to the contradiction of other witnesses. The evidence was suscep-

tible of the finding that the mother's inaction in light of her child's vomiting, diarrhea, high fever, subsequent unconciousness, and breathing failure created a "substantial and unjustifiable risk" of death. *Commonwealth* v. *Godin,* 374 Mass. 120, 130 (1977). "Such evidence, if believed, would warrant the jury in concluding that the defendant should have been aware and indeed was aware of the increased risk of harm and thus [her] failure to remedy the situation was the kind of conduct which constitutes wanton and reckless conduct." *Id.*

As to the Commonwealth's commission theory, there was evidence of one instance of a bruise inflicted by the defendant on Jennifer's cheek. Juxtaposing this with the evidence of repeated aggravated batteries suffered by Edward, which we determine, *infra,* was admissible as to Jennifer, the jury might infer that Jennifer was similarly treated. The defendant could be heard daily "hollering" at and "spanking" one or both children. The secret concealment and disposal of Jennifer's body permit the inference that her body, if discovered, would have shown signs of physical abuse. These separate inferences, though hardly compelled, are more than merely speculative. See *Commonwealth* v. *Best,* 381 Mass. 472, 483 (1980). Contrast *Commonwealth* v. *Rosenberg,* 379 Mass. 334, 343 (1979) (Commonwealth failed to present more than speculative inference of scienter).

Evidence of the mistreatment of Edward was probative also of the defendant's mental state at the time of Jennifer's death. See *Commonwealth* v. *Estremera, ante* 382, 392-393 (1981); *Welansky, supra* at 398, 400 (wanton, reckless conduct is intentional conduct). Also, the defendant admitted to concealing the child's body, surreptitiously disposing of it, and concocting a fiction that Jennifer was with the defendant's mother or her husband's family. These indicia of consciousness of guilt, though not conclusive, were probative strands from which the jury might construct "[a] web of convincing proof " *Best, supra* at 483.

Even if we accept arguendo the defendant's contention that the Commonwealth failed to adduce evidence of man-

slaughter by the beating of Jennifer, the evidence of manslaughter by omission was sufficient to persuade the jury. If the evidence on either theory sufficed, a verdict could not have been directed. See *Commonwealth* v. *Podlaski,* 377 Mass. 339, 343-344 & n.5 (1979).

The defendant further argues a total lack of evidence on the question of the cause of Jennifer's death. Medical evidence was precluded by the incineration of the child's body. However, there was evidence to support the inference that the defendant's failure to get medical help set in operation the factors which caused the death. See *Commonwealth* v. *Rhoades,* 379 Mass. 810, 817 (1980). The defendant's statements, corroborated through the testimony of Dr. Reece, depicted the rapid deterioration of Jennifer's resistance to an "infectious process," very likely pneumonia. The jury were free to conclude from their own common knowledge and experience that failure to obtain emergency treatment for a child with extreme fever and unconsciousness hastened the child's death. *Commonwealth* v. *Giacomazza,* 311 Mass. 456 (1942). *Commonwealth* v. *Hackett,* 2 Allen 136 (1861). *Commonwealth* v. *Fox,* 7 Gray 585 (1856). See generally 9 J. Wigmore, Evidence § 2570, at 542-547 (3d ed. 1940).

b. *Assault and battery by means of a dangerous weapon.* The defendant concedes that there was substantial evidence that Edward was a battered child but challenges the sufficiency of the evidence to show that she in fact burned the child's buttocks with a lighted cigarette. Because there were two parents in the home, the defendant argues that it is equally probable that either parent inflicted the burns. This contention is refuted by the record.

Although witnesses testified that both the defendant and her husband smoked cigarettes, there was no evidence before the jury that the father struck the children. The testimony of Timothy Mullins, Mary Brown the downstairs neighbor, and Carolyn Punch the social worker, was that the defendant disciplined the children, that the hollering and spanking occurred at times when the defendant was alone with the

children. There was evidence that the leathery condition of Edward's buttocks was caused by an object other than a hand. There was also evidence that the circular scars on the child's buttocks were caused by a lighted cigarette. Taken as a whole, the evidence permitted the inference that on at least one occasion the defendant applied a lighted cigarette to the boy's buttocks.[5] See *Latimore, supra* at 678-679.

Even if the scars presented to the jury by means of photographs are assumed to have been inflicted by Edward's father, there was sufficient evidence to warrant the verdict on a joint venture theory. From evidence of her other acts of abuse upon Edward the jury might deduce a shared mental state. The two parents' complicity in concealing Jennifer's body adds substance to the possibility of their cooperative enterprise in inflicting the burns on Edward. See generally *Commonwealth* v. *Casale,* 381 Mass. 167, 173-174 (1980); *Best, supra* at 481-483. Moreover, the Commonwealth was not obliged to prove that no one other than the defendant committed the act. *Casale, supra* at 175. The judge charged the jury on the theory of joint enterprise. The Commonwealth met its burden to adduce probative evidence of the defendant's commission of, or complicity in, the criminal act.

2. *The Manslaughter Instructions.*

The defendant complains that the judge's instructions as to manslaughter improperly reduced the standard of evidence required for conviction of involuntary manslaughter. The defendant cites in the first instance the language of the charge that wanton or reckless conduct might consist of "disregard of the probable harmful consequences . . . *or* the alleged victim's right to care" (emphasis supplied).

The defendant claims that the instructions permitted a conviction merely on finding mistake, negligence, or inad-

---

[5] The defendant stated that her husband physically attacked her when he had been drinking. The jury might have chosen to regard this as a self-serving statement unrelated to her husband's treatment of the children. See, e.g., *Commonwealth* v. *Albano,* 373 Mass. 132, 134 (1977) (credibility and weight of the evidence for the jury).

vertence.  The claim is asserted for the first time on appeal.
No objection was made at trial to the charge which raised
this issue.  It is a fundamental principle of appellate review
that a prompt objection at trial is a prerequisite to the
presentation of an issue for appellate review.  *Common-
wealth* v. *Daniels,* 364 Mass. 829 (1973).  Contrast *DeJoin-
ville* v. *Commonwealth,* 381 Mass. 246 (1980) (constitu-
tional issues, later decided, may be considered in the
absence of objection).  The defendant asks that we consider
the issue, nevertheless, to avoid "a substantial risk of a mis-
carriage of justice."  *Commonwealth* v. *Freeman,* 352
Mass. 556, 564 (1967).  We have reviewed the charge in
light of this test.  We find no such risk in that the charge
was properly based on *Welansky, supra,* and correctly
stated the law as to manslaughter.  There is nothing in the
charge which could have led the jury to make a finding of
guilty based on mere mistake, negligence, or inadvertence.

The defendant also claims error in the judge's response to
the jury's question, set out in the margin.[6]  The judge ex-
plained that manslaughter might be found "if the defendant
intentionally or recklessly and wantonly failed to provide
proper necessary care, and, as a result of that, the child
died."  The defendant made a timely objection to this
response, but there is no merit in the defendant's suggestion
that these words placed before the jury a third standard of
conduct, lower than wanton, reckless disregard of probable
harm.  The phrase "failed to provide proper necessary care"
specified the acts of omission which the jury were to eval-
uate by the wanton, reckless standard.

The major thrust of the defendant's challenge to this
language is that the use of the disjunctive "or" between "in-
tentionally" and "recklessly and wantonly" created a lower
standard of culpability than the mens rea contemplated by
*Welansky.*  The logic of this proposition eludes us.  To say

---

[6] "Does manslaughter necessarily have to result from assault and beat-
ing or can it result from wilful failure to provide proper and necessary
care, or from wanton or reckless conduct, which results in death?"

that the defendant's behavior was intentional requires a very high showing of consciousness of harm and actual intent to bring about that harm. See *Commonwealth* v. *Hall,* 322 Mass. 523, 527-528 (1948) (intentional withholding of infant's food constituted murder in the second degree). If anything, the *Welansky* language sets a lesser standard than "intentional" conduct for conviction. Thus, any error in the use of the word "intentional" inured to the defendant's benefit because the jury were asked to reach their verdict on the basis of a standard even higher than that of *Welansky.* See generally *Commonwealth* v. *McLaughlin,* 364 Mass. 211, 224 (1973) (no reversible error where Commonwealth rather than defendant suffered prejudice). Reading the charge as a whole, we conclude that the judge correctly defined involuntary manslaughter.

3. *Jury Unanimity.*

The defendant makes the claim also for the first time on appeal that the judge's instructions on alternate theories of manslaughter permitted the jury to return a nonunanimous verdict.[7] These instructions were consistent with the evi-

---

[7] The defendant challenges this language which occurs in the main body of the instructions: "What the Commonwealth argues here, and urges that you find, is either one of two things: Either this defendant so abused, intentionally abused, knew what she was doing, the daughter, that, as a result of that abuse, the daughter died, although the defendant specifically did not intend to kill her daughter. That is one theory that the Commonwealth is going on.

"The other theory that the Commonwealth is going on is that the defendant, again, did not intend to kill her daughter, but she acted so wantonly or recklessly in neglecting her daughter that she should be tagged with manslaughter. And that is the Commonwealth's second theory.

"And you can accept either theory or both theories, or you can reject each theory. If you accept either theory, or both theories, you have to do so beyond a reasonable doubt. The Commonwealth has to prove its case with respect to either or both of those theories beyond a reasonable doubt."

Later, in response to a question by the jury, the judge stated: "There are two ways you can go here with respect to that manslaughter indictment.

"The first way is, if the facts justify it, if you believe and *agree unanimously* that the Commonwealth *has proved beyond a reasonable doubt* that this defendant, by means of assault and battery, although not

dence adduced. *Commonwealth* v. *Harrison,* 365 Mass. 235, 237 (1974). See our discussion, *supra,* of the directed verdict claims. The judge explicitly required unanimity on either or both theories of guilt. There was no error. Hence we cannot perceive any "substantial risk of a miscarriage of justice" on this point. *Freeman, supra* at 564.

4. *Severance of the Charges.*

The defendant reasserts on appeal her claim, twice rejected on pretrial motions, that failure to sever the charges relating to Jennifer and Edward was so prejudicial as to deny her a fair trial. Severance is a matter for the discretion of the trial judge, *Commonwealth* v. *Cruz,* 373 Mass. 676, 690-691 (1977), and we review the exercise of that discretion by the guidelines expounded in *Commonwealth* v. *Blow,* 362 Mass. 196, 200 (1972). Those criteria permit joinder of charges where the offenses constitute a single line of conduct, grow out of essentially one transaction, and would be proved by substantially the same evidence. *Id.* Conversely, under *Blow* severance is required where the above criteria are not satisfied and the defendant may be prejudiced by the cumulative evidence of the several offenses. *Id.* at 201. This court concluded in *Blow* that the dubious relevance of other acts committed during the same time frame was outweighed by the prejudicial effect on the jury. *Id.* We determine to the contrary here.

The defendant bears the burden to show that prejudice will result from failure to sever. *United States* v. *LaFond,* 482 F. Supp. 1379, 1387-1388 (E.D. Wis. 1980). This burden includes a showing that any prejudice from joinder is beyond the curative powers of the court's instructions.

necessarily with the intent to kill, caused injuries that resulted in the death of Jennifer Lisa Gallison, you can find manslaughter from that.

"*Alternatively,* you can, *if you so find* the facts as proved to you *beyond a reasonable doubt* by the Commonwealth, *if the defendant intentionally or recklessly and wantonly failed to provide proper necessary care,* and, as a result of that, the child died, you can find manslaughter from that, also. Or you can find both. *Manslaughter can result from both, or from either one*" (emphasis supplied).

No objection was raised by the defendant at either time.

*United States* v. *Avarello,* 592 F.2d 1339, 1346 n.10 (5th Cir.), cert. denied, 444 U.S. 844 (1979). Prejudice requiring severance does not arise from the mere fact that the defendant's chances for acquittal of the manslaughter charge might have been better had the manslaughter indictment been tried separately from the indictments charging assault and battery of Edward. See *United States* v. *Knife,* 592 F.2d 472, 480 (8th Cir. 1979). The defendant has not claimed that a particular defense tactic or right was foreclosed by the joinder. Contrast *Commonwealth* v. *Nassar,* 351 Mass. 37, 45 (1966) (but for admission of fact of prior arrests, defendant would not have testified). See generally *Drew* v. *United States,* 331 F.2d 85, 88 (D.C. Cir. 1964). The nub of the defendant's claim is that trial of both indictments created a "seepage . . . of evidence not otherwise admissible" against her. See *Commonwealth* v. *Beneficial Fin. Co.,* 360 Mass. 188, 221 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts,* 407 U.S. 910, and *Beneficial Fin. Co.* v. *Massachusetts,* 407 U.S. 914 (1972). The cogent consideration in this appeal thus reduces to the evidentiary question: Would the evidence as to Edward have been admissible in a separate trial for manslaughter of Jennifer?

In Massachusetts, evidence of other criminal behavior may not be admitted to prove the propensity of the accused to commit the indicted offense but it is admissible for other relevant probative purposes. *Commonwealth* v. *Chalifoux,* 362 Mass. 811, 815-816 (1973). See generally W.B. Leach & P.J. Liacos, Massachusetts Evidence 302-303 (4th ed. 1967). The testimonial and photographic evidence of abuse of Edward in the same household as Jennifer, during the period from September through February, was sufficiently related in time and location to be logically probative. See *Commonwealth* v. *Cruz, supra* at 691. That Edward was physically abused and neglected during the time frame of Jennifer's death bears on the defendant's mental state at the time of Jennifer's death. *Commonwealth* v. *Schoening,* 379 Mass. 234, 242 (1979). *Commonwealth* v. *Cutler,* 356 Mass. 245, 248 (1969). Evidence of the defendant's reckless

and wanton state of mind as to the physical well-being of both children serves to refute the possibility that Jennifer's death came about through accident, mistake, or inadvertence. See *Commonwealth* v. *Sellon*, 380 Mass. 220, 231-232 (1980). The evidence concerning Edward formed a temporal and schematic nexus with the treatment of Jennifer which rendered it admissible also to show a common course of conduct regarding the two children. *Schoening, supra* at 242.

The cases which the defendant cites to negate admissibility are distinguishable. In *Commonwealth* v. *Nassar, supra* at 44-45, evidence of a sixteen year old murder accusation was irrelevant not only because of its prejudicial effect but because of its remoteness. The facts at issue here, by contrast, were carefully circumscribed to the six-month period when the children were returned to their natural mother until her arrest. The fact that the photographic evidence of Edward's bruises and injuries postdates Jennifer's death does not render it irrelevant for purposes of demonstrating the defendant's ongoing course of conduct. See *Cruz, supra* at 690-691. Other cases relied on by the defendant are also factually distinguishable. In *Commonwealth* v. *Valcourt*, 333 Mass. 706, 717-718 (1956), evidence of failure to file tax returns two years before the act of arson being tried was inadmissible because it fell short of the very threshold of relevance; it was not logically probative. So also may the holding of *Commonwealth* v. *Ellis*, 321 Mass. 669, 670 (1947), be differentiated from our conclusion that the defendant's treatment of Edward is probative in the case about Jennifer. See, e.g., *Commonwealth* v. *Machado*, 339 Mass. 713, 715 (1959) (evidence of similar acts in same home with same victim not remote). The Supreme Judicial Court of Maine noted in this context: "Many crimes are committed in secret. In such case the State must forge a chain of circumstances, each essential link proven beyond a reasonable doubt, and the whole pointing inexorably to guilt as the only rational hypothesis. When, as here, the alternative is accidental causation, the circumstantial evidence must rule out accident as a rational or reasonable explanation of

death" (citations omitted). *State* v. *Silva,* 153 Maine 89, 93 (1957).

The defendant's trial counsel proffered the testimony of a physician that abuse of one child need not mean abuse of its siblings. The over-all effect of the statements of defense counsel, in counterpoise to those of the prosecutor, was to delineate the separate applicability of the evidence. In his closing argument defense counsel cautioned the jury to keep separate the defendant's treatment of the two children, but he made no request for limiting instructions.[8] See *Commonwealth* v. *Campbell,* 371 Mass. 40, 43 (1976) (curative instructions approved). See also *Commonwealth* v. *Fluker,* 377 Mass. 123, 131 (1979) (failure to request appropriate instructions precludes appellate review).

Without intimating that limiting instructions would have been required, we conclude that there was no error.

*Judgments affirmed.*

---

[8] The pretrial motion judge apparently believed curative instructions would be appropriate and recommended this option to the defendant's counsel.