COMMONWEALTH vs. EDWARD R. GALLISON.

Middlesex.  May 5, 1981. — July 31, 1981.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS, & ABRAMS, JJ.

*Homicide.  Practice, Criminal,* Instructions to jury, Argument by prose-
cutor, Severance.  *Evidence,* Relevancy and materiality.

At the trial of indictments, including manslaughter in the death of the de-
fendant's two year old child and unlawful disposition of a human
body, the judge's instructions to the jury on the charge of unlawful dis-
position, which, in effect, directed a verdict of guilty on that charge
and which he delivered in proximity to his instructions on the man-
slaughter charge, were not prejudicial to the defendant, where the
judge properly described the charges seriatim and treated the offenses
separately.  [192-193]
A judge's instructions to a jury which characterized manslaughter as the
"lowest and least blameworthy form of criminal homicide," when
viewed in context, did not prejudice the defendant by trivializing the
jury's function.  [193-194]
At the trial of an indictment for manslaughter in the death of the defend-
ant's two year old child, the prosecutor's closing argument, which dis-
cussed manslaughter both on the theory of unjustified assault and bat-
tery and the theory of reckless omission, was consistent with the evi-
dence, including the defendant's statement at the time of his arrest,
and was entirely proper.  [194-196]
Where a defendant charged with manslaughter in the death of his two
year old child admitted, at the time of his arrest, that he had placed
the victim's body in a trash barrel, testimony concerning a city's trash
incineration process was properly admitted at his trial to meet the
Commonwealth's burden of explaining the lack of medical evidence of
the victim's death.  [196-197]
No error appeared in a judge's failure to sever the trial of an indictment
for manslaughter in the death of the defendant's two year old child
from the trial of indictments, on which he was acquitted, charging
him with assault and battery on his other child where the evidence on
the latter indictments was admissible to show a common course of con-
duct toward the two children and lack of inadvertence in the death of
one of them.  [197]

INDICTMENT found and returned in the Superior Court on June 9, 1978.

A motion to sever was heard by *Sullivan, J.*, and the case was tried before *Taveira, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Henry P. Sorett (Frank P. Marchetti* with him) for the defendant.

*Robert M. Raciti*, Assistant District Attorney, for the Commonwealth.

LIACOS, J.  On November 1, 1979, a Bristol County jury[1] convicted the defendant of manslaughter, G .L. c. 265, § 13, in the death of Jennifer Lisa Gallison, age two.  He was found guilty, as well, of two counts of failure to provide care for a minor, G. L. c. 278, § 1, and of unlawful disposition of a human body, G. L. c. 114, § 43M.  The defendant was sentenced to serve eighteen to twenty years at the Massachusetts Correctional Institution at Walpole on the manslaughter conviction.[2]  The other three convictions were placed on file, with the defendant's consent.[3]  The jury acquitted the defendant of charges of assault and battery by

---

[1] Originally indicted in Middlesex County, the defendant was allowed a change of venue to Bristol County.  The defendant's wife, Denise Gallison, was indicted at the same time, but she was tried separately.

[2] The defendant's pro se appeal from this sentence, pursuant to G. L. c. 278, §§ 28A-28C, and Rule 64 of the Superior Court (1974), to the Appellate Division of the Superior Court was dismissed.  His wife Denise Gallison, similarly sentenced on convictions for manslaughter and for assault and battery by means of a dangerous weapon, obtained a reduction of sentence from the same panel of judges.  *Commonwealth* v. *Denise Gallison*, 383 Mass. 659, 660 n.1 (1981).  We make no attempt to second-guess the reasons underlying the different results in the two sentence appeals.  Nor is it our function to review the severity of a sentence.  *Commonwealth* v. *Appleby*, 380 Mass. 296, 312 (1980).  See *Commonwealth* v. *Franks*, 365 Mass. 74, 81 (1974).

[3] We thus decline to take up the defendant's claim that the judge's comment to the jury in effect directed an unfavorable verdict on the charge of improperly disposing of a human body.  See *Commonwealth* v. *Denise Gallison, supra* at 660 n.2.

means of a dangerous weapon, G. L. c. 265, § 15A, and of assault and battery, G. L. c. 265, § 13A, on his three year old son, Edward, Jr. Therefore, only the manslaughter charge is before us on appeal. We affirm the conviction.

The defendant claims error in the juxtaposition in the judge's charge of his instructions on manslaughter and his instructions on unlawful disposition of a human body, as well as in the judge's instruction that manslaughter is "the lowest and least blameworthy form of criminal homicide." He also argues that the prosecutor presented a wholly new theory of manslaughter in his closing statement, thereby commenting on facts not in evidence and creating a prejudicial variance between the theory developed at trial and in the summation. His third challenge pertains to the relevance of the Commonwealth's introduction of evidence of the trash incineration process for the city of Somerville. Finally, the defendant asserts prejudice from the denial of his pretrial motion to sever the charges as to the boy victim from those concerning Jennifer.

The Commonwealth presented the following evidence on the manslaughter charge. On May 12, 1978, the police and social workers appeared at the Gallisons' home to investigate a report of child abuse. Initially refused admittance to the apartment by the defendant's wife, the group were subsequently let into the apartment by the defendant. They found Edward, Jr., alone in the apartment, badly bruised all over his body. Edward, Jr., was taken from his parents on that day. The police searched the apartment for Jennifer, the Gallisons' younger child. The defendant responded to inquiry by the police that as far as he knew the child was with relatives in Texas.

After contacting police in Houston, Texas, the Somerville police arrested the defendant on May 14, 1978. The defendant then volunteered a statement about Jennifer's death. Later that day the police recorded the defendant's account of Jennifer's death. This statement was read in evidence at the trial by one of the interviewing police officers, Lt. Thomas Spartichino. The defendant did not testify. His recorded

version of the circumstances of Jennifer's death conformed in essence to that presented at the earlier trial of his wife, Denise Gallison. See *Commonwealth* v. *Denise Gallison,* 383 Mass. 659, 663-664 (1981).

The defendant told police that he arrived home from work about 7 P.M. on the evening of the "second snowstorm" of February 6, 1978. His wife asked him to go to the store for some food. He did this, and returned to the apartment to find his wife applying mouth-to-mouth resuscitation to Jennifer, who was lying on the kitchen floor. He ran to help his wife, but in vain. Jennifer "just laid still." After forty-five minutes of trying to revive the child he figured she was dead because he "didn't feel any pulse or anything." He put Jennifer to bed in the same bedroom as the couple's son Edward. He did not call a doctor or the police. He said he did not want to upset his mother by calling her. There was a stipulation at trial that neither the defendant nor his wife phoned for ambulance service that evening. The defendant and his wife went to bed. They arose that next morning about 5:30 A.M.. The defendant's wife checked the baby and found her "ice cold."

The defendant related that his wife was nervous and shaky and that he didn't know what to do. Two nights after the baby died he tried to "dig a couple of holes" near railroad tracks to bury her, but "the ground was too solid." The baby remained on a foldaway cot in the back bedroom for some six weeks, during which time the defendant left the window of the back bedroom open "to air it out." Around the fifth week the body began to smell and the defendant decided to put it into a plastic trash bag, which he then placed into a large carton and covered with newspapers. Before packing the baby's body the defendant said he dressed it in slacks, socks and shoes, boots, and a hooded ski jacket because he "felt sorry for her" and "didn't want to bury her with nothing on." Without assistance from his wife he dressed the body, packed it, and carried the box out of the house by way of the front stairs about 3:00 A.M. Then he walked a short distance away from his house to a spot

where trash barrels were standing, in front of a statue the defendant believed was the Blessed Mother. "[S]o I put it there; and then I blessed myself." The defendant walked by that spot again that evening (which police figured to be March 10, 1978) to check whether "[e]verything was gone."

In the same statement, recorded on the day of his arrest, the defendant denied that he killed or ever struck Jennifer. "I didn't lay a hand on her." He denied that his wife ever abused Jennifer, stating that he saw her hit only their son Eddie just once. He claimed that he stopped his wife if he saw her hitting either of the children. The defendant explained that he first made up a story that Jennifer was away in Texas when the police asked about her whereabouts on May 12. He denied planning a cover-up story with his wife before that moment.

The Commonwealth's chief witness was Denise M. Gallison, the defendant's wife and Jennifer's mother, who had earlier been convicted of the same charges. Denise Gallison had made several statements to the police; those of May 4, 1978, were used at her own trial. See *Commonwealth* v. *Denise Gallison, supra* at 663-664. At her husband's trial Denise repeated from the witness stand an account of Jennifer's death which she had offered to Lt. Spartichino on April 6, 1979, at her place of incarceration, the Massachusetts Correctional Institution at Framingham. This new account of the events leading to Jennifer's death was given about four months after her trial and conviction.

Denise Gallison testified that on the first day of the severe blizzard her husband returned home from work about noon. She stated he went out shortly thereafter to buy beer, and spent the rest of the afternoon sitting in the living room drinking. The pair had been arguing "[j]ust about all day." She described the arguments as "violent" to the point that "[h]e punched me." After dinner, about 6:00 P.M. the two were in the living room still arguing. The children were in the same room playing. At one point Denise Gallison led Jennifer to the kitchen to clean her off "[b]ecause she had vomit all over her."

Denise Gallison stated she was holding Jennifer's hand and walking with her into the kitchen. As she stood on the step facing into the kitchen her husband "came over and started to argue with me and he pushed [Jennifer]." She described the push as a vicious one which sent the little girl "flying" into a kitchen chair. The child struck her upper left temple on the corner of a wooden chair and then "just laid there unconscious."

Mrs. Gallison described a dent in Jennifer's forehead about two inches long, not very wide, and purplish in color. She related that the defendant stood in the doorway laughing while she tried to revive the child. Denise Gallison further testified that she did not call for help to resuscitate Jennifer because her husband threatened her. Then the pair brought the child to the children's bedroom, pulled the covers up, and went to bed themselves. The next morning they decided that Jennifer was dead because she felt "ice cold." Later that afternoon they removed the body from the children's bedroom to a back room that Denise Gallison described as the storage room.

Every night of the six weeks the child's body remained in the storage room, Denise Gallison stated, the defendant made her go into the room to look at the body. She said, "He'd just stand there and laugh," when she started to cry. On the Thursday before Easter, by her account, the defendant — who had been drinking — forced her to go into the back room and watch as he put Jennifer's barely clad body on a low, wooden table and cut off her arms, legs, and head. The witness recounted that the defendant laughed as he did this. After washing his hands in the bathroom, he put the child's dismembered legs and arms in a paper bag and then a plastic bag. The body and head he placed in a large plastic bag and then a box. Hours later, about 3:00 A.M., the defendant removed one bag from the apartment, then made a second trip to remove the large box.

In response to questions about the defendant's treatment of the two children, Mrs. Gallison described one incident a couple of weeks before Jennifer died when the defendant

struck the child on the head with his fist. Asked about the discrepancy between her testimony and earlier statements, Mrs. Gallison explained, "My husband threatened to get me if I said anything."

The Commonwealth also put in evidence a knife and axe which Mrs. Gallison had returned to a cabinet in the storage room after Jennifer's body was removed. These two objects were taken from the apartment on May 26, 1978. Lieutenant Spartichino kept the knife and axe in the trunk of his police cruiser from May 26, 1978, until April 10, 1979, some four days after interviewing Denise Gallison in the Massachusetts Correctional Institution at Framingham. He then submitted the items to the State police chemical laboratory for examination.

The examining chemist testified that there were trace amounts of blood on the axe handle and head, and on the knife handle and blade. However, the expert was unable to state whether the traces were human blood because the scant amounts present provided no "visible amount to work with" in performing dried stain blood grouping.

The defense presented the earlier recorded testimony of the Gallisons' downstairs neighbor, Mary Brown, who had testified at the trial of Denise but was unavailable for the trial of Edward. The witness attested therein to hearing sounds of slapping, hollering, and "thuds" as if someone fell down during the daytime hours when Denise was alone with the children. The witness remarked that the defendant "was generally working in the daytime" and consistently referred to Denise as doing the slapping and hollering.

The defense called as a witness one Paul DiPietro who presented records of the St. Vincent DePaul Society to the effect that, on February 8, 1978, the Gallisons had two children, Edward, Jr., and Jennifer, living with them. The records were made as a result of the defendant's request for assistance to purchase $12 worth of groceries. The witness was unable to verify, however, that any member of his organization had in fact visited the Gallison household on February 8, 1978.

The essence of the defense was to impeach the testimony of Denise Gallison. This the defense counsel did most vigorously by raising inconsistencies between her prior statements, given on May 14, 1978, and April 6, 1979, and her in-court testimony at his trial. The statement originally made on the day of her arrest and offered at her own trial, see *Commonwealth* v. *Denise Gallison. supra* at 663-664, conformed in essence to the defendant's account. Jennifer was sick with high fever and vomiting; the defendant was not home but at the store when Jennifer collapsed; he helped his wife to apply resuscitation when he returned from the store. Defense counsel reviewed detail-by-detail inconsistencies in such matters as the dress of the baby's body, the number of plastic trash bags, the number of trips her husband made when disposing of the body, the defendant's work schedule, the couple's arguing, the defendant's general treatment of Jennifer, the defendant's state of insobriety, and his whereabouts when Jennifer fell to the floor. The defense counsel offered Jennifer's birth certificate as rebuttal evidence of Denise's statement, made for the first time at her husband's trial, that the defendant was not Jennifer's father.

Defense counsel thoroughly probed the witness's motive for testifying against her husband. He countered her assertion that she hated her husband by presenting numerous letters expressing her love for him, which she had written from the time of their arrest until some twenty days before her husband's trial. To refute the witness's claim that she feared the defendant, defense counsel elicited Mrs. Gallison's acknowledgment that from the moment of their arrest she was detained separately from her husband under police security. The witness admitted her earlier statement that she had feared the police and the welfare department.

Cross-examination revealed that the witness first made a statement against her husband on April 6, 1979. She had heard about Lt. Spartichino's recovery of the knife and axe some time before that date. At the time of her April 6 interview Denise Gallison had an appeal pending from her con-

viction for the same crime. At M.C.I., Framingham, she had given birth six months earlier to a child with whom she was pregnant on the day of her arrest. That child, Eric, had been adopted by the defendant's married sister living in Texas. Between the time of her trial and the April 6 interview, Denise Gallison had had interviews with television reporters and someone preparing to write a book. She kept in contact with her attorney, who in turn had been apprised shortly after her trial of the removal of the knife and axe from the Gallisons' apartment.

1. *The judge's charge on manslaughter.* We note at the outset that no requests for manslaughter instructions appear on this record. Nor were objections to the judge's instructions raised at trial. In such a case we review the defendant's claim solely to determine whether there has been a miscarriage of justice. *Commonwealth* v. *Redding,* 382 Mass. 154, 155 (1980), and cases cited therein. In so doing we evaluate the effect of the totality of the charge on the jury, as the defendant correctly notes. See, e.g., *Commonwealth* v. *Ramey,* 368 Mass. 109, 113-115 (1975). The defendant cites the following aspects of the charge as offensive and prejudicial. The judge discussed the charge of improper disposal of the body just before and immediately after discussing the manslaughter charge. Although the defendant does not appeal from his conviction on the lesser charge, note 3, *supra,* he argues that the judge's directive language as to that accusation tainted the jury's understanding of the manslaughter case. We disagree.

The judge discussed each indictment by turn, explaining manslaughter last. His discussion of the improper disposition charge did immediately precede the manslaughter instruction. However, we cannot concur in the defendant's assertion that the judge's language, "there can be no question about his guilt of this particular indictment," poisoned the ensuing manslaughter section. By describing the charges seriatim, the judge clearly treated the offenses separately. There is no merit in the defendant's additional claim that the judge improperly directed the verdict on the disposition

charge immediately after the manslaughter instruction and hence effectively directed as to manslaughter. The charge on manslaughter takes six and one-half pages of transcript. The judge then elaborated a number of totally distinct considerations.[4]  Following these intervening instructions the judge recapitulated each charge, instructing the jury how to report its verdicts on the verdict slip.  Here, the judge again proceeded seriatim, beginning with manslaughter and finishing with unlawful disposition of a human body, again effectively directing the verdict on that charge alone.[5]  Our reading of the language in the over-all context of the charge does not disclose the prejudicial juxtaposition portrayed by the defendant.  The defendant has not shown improper judicial comment.  Contrast *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980).

The second challenge the defendant raises to the manslaughter instruction is that the judge trivialized the jury's role in deliberating on the issue of manslaughter by characterizing the offense as the "lowest and least blameworthy form of criminal homicide."  Again, examining this phrase within the context of the over-all charge, there was no error. *Commonwealth* v. *Sellon*, 380 Mass. 220, 231-232 (1980). The judge used that language to highlight for the jury the distinction between the manslaughter charge being tried and other homicide offenses.  He broke homicide down into degrees of murder and types of manslaughter, explaining that involuntary manslaughter may occur when death results either from wanton, reckless conduct or from an unjustified battery.  The defendant does not question that the evidence

---

[4] He discussed, for example, the interrelationship of drunkenness and criminal responsibility, impeachment, credibility, business records, and the defendant's decision not to testify.  This discussion filled five pages of the transcript.

[5] While a directed verdict of guilty is not permissible, there was no objection made and, indeed, defendant's counsel concurred in his closing argument with the judge's view that the defendant had violated G. L. c. 114, § 43M.

would support either theory presented in the charge.[6]  Nor
do we.  The defendant's analogy to such of our decisions as
*Commonwealth* v. *Garcia*, 379 Mass. 422, 440 (1980),
which reject trivial analogies to the reasonable doubt stand-
ard, is simply inapposite here.

2. *Variance in the prosecutor's closing argument.*  Again
by way of claim raised for the first time on appeal, the de-
fendant urges that the prosecutor improperly surprised him
and the jury by suggesting a theory of manslaughter by
omission for the first time in his closing statement.  The de-
fendant claims that the indictment itself, phrased, "did
assault and beat one Jennifer Lisa Gallison and by such
assault and beating did kill [her]," as well as the
prosecutor's opening statement focusing on Denise
Gallison's expected description of the defendant's pushing
Jennifer, made out only one theory of manslaughter, viz.,
death resulting from an unjustified assault and battery.
The defendant now argues that his entire defense at trial
went to rebut only this theory of guilt; that he had no op-
portunity to refute the prosecutor's last word, and that the
judge improperly permitted the prosecutor to comment on
facts not in evidence.  We have examined the record in vain
to find any substance in these allegations.

With regard to the wording of the indictment we take no-
tice that the words quoted above are the standardized, tra-
ditional phrasing of every manslaughter indictment.  G. L.
c. 277, § 79.  The explication of the various theories of
manslaughter is for the judge who reflects in his instructions
all the theories suggested by the evidence.  We noted earlier
that the judge instructed, without objection, on both a reck-
less omission theory and an assault and battery theory.  This
case is unlike *Commonwealth* v. *Edelin*, 371 Mass. 497,
520-522 (1976), to which the defendant draws an analogy.
Here, unlike *Edelin*, the elements of both manslaughter the-

---

[6] The defendant does claim on appeal that the prosecutor improperly
argued manslaughter as a wanton, reckless omission to act, see text, *infra*,
but appears not to have translated that assignment of error into the
judge's charge.

ories were in evidence. Although the prosecutor's opening statement enlarged upon the battery theory, the prosecutor did refer to alternative evidence which the jury could draw from the defendant's statement. "I won't belabor you now with it, because it would be merely repetitive of when the statement is read." Admittedly, this offhand reference did not lay out the omission theory to the jury. But it certainly served to give the defendant notice that his earlier statement, which included his explanation for his failure to obtain outside help for Jennifer, would be put in evidence. The purpose of the opening statement is to outline the Commonwealth's prima facie case. Suggestion of possible inferences or theories is better reserved for the closing comments.

Here, if the jury chose to believe Denise Gallison's testimony they might find manslaughter by assault and battery. If the jury disbelieved Denise Gallison, as the prosecutor suggested[7] in his closing argument, and believed the defendant's statement, they could have inferred from the defendant's failure to seek help when his child appeared fatally ill, a wilful and wanton disregard of his duty to care for his sick child. This is the theory of manslaughter defined in *Commonwealth* v. *Welansky*, 316 Mass. 383, 399 (1944), which the judge outlined at length.[8]

---

[7] His remarks in pertinent part were: "So, I say to you: you may believe Denise Gallison when she says he struck the child and the child fell and hit her head, or you may not. You may believe this man when he says he went home, he knew the child was sick; he had a duty and an obligation to do something and he wilfully failed to. He didn't do it. Why didn't he do it? Because he was afraid for his own skin and his wife's skin. That's why it wasn't done by him or his wife.

"So, I say to you: believe whichever version you want, but there are only two for you; because, fact, the child died. Fact, this man was there. Fact, he had an obligation to act and he didn't do so. And that failure was willful and that child died as a result. Or believe, if you want, Denise Gallison and her accounting of the facts. I say to you on those charges it makes no difference."

[8] The judge stated: "The essence again of wanton or reckless conduct is intentional conduct by way either of omission or commission — either by doing something which amounted to wanton or reckless conduct, or by failing to do something, failing to take action which amounted to.wanton or reckless conduct."

The jury heard the defendant's statement of May 14, 1978, that, despite the child's unconsciousness, he failed to call the police, an ambulance, or any other outside help. Instead, he put the child into a bed in a barely heated bedroom separate from himself and his wife, not knowing whether she were still alive or dead. The defendant knew well in advance of trial that his statement would be put in evidence by the Commonwealth. In fact, defense counsel relied on that same statement in his closing. "And that's the record we stand by." It is palpably inconsistent for the defendant to argue lack of notice at this juncture. The prosecutor's argument was consistent with the evidence, and entirely proper. The defendant may not choose this forum to reshape his trial counsel's tactical decision to focus his final remarks on the credibility of Denise's testimony rather than explore the alternative implications of the defendant's statement. See *Commonwealth* v. *Lee*, 383 Mass. 507, 512 (1981); *Commonwealth* v. *Johnson*, 374 Mass. 453, 465 (1978).

3. *Admissibility of testimony concerning the Somerville trash incineration process.* The defendant claims that the evidence tracing the handling of refuse of the city of Somerville from pick-up through incineration irreparably prejudiced the jury by "conjuring up an Auschwitz-like image." The witness, Lt. Spartichino, recounted that he saw trash deposited "into a terraced oven of three levels. And from there it would burn and it would burn and it would burn." Upon defense counsel's objection, the judge instructed the jury to disregard the triple repetition of the phrase "it would burn."[9]

The defendant appears to assume that the evidence of incineration related only to the charge of improper disposition

---

[9] We do not find support in the record for the defendant's assertion that "[d]espite the Judge's ruling, the prosecutor persisted improperly." After the judge granted the defendant's request to strike repetition of the word "burn," the prosecutor posed two or three further questions and elicited a toned-down description of the process. Then he went on to other lines of inquiry.

of a body. In so far as that crime was made out simply from the defendant's own statement that he put the child's body into the trash some six weeks after the child's death, G. L. c. 114, § 43M, the relevance of the evidence to that charge is questionable. The fact of incineration, however, was highly probative to meet the Commonwealth's burden to explain why there was no medical evidence of the cause of Jennifer's death. This evidence was both logically and legally relevant. There was no error.

4. *Failure to sever the charges.* The defendant's final basis for appeal is that the joinder of the manslaughter charge with those of assault and battery on Edward prejudiced the jury by cumulating the emotional impact of the evidence.[10] He states that virtually all the evidence pertaining to the boy would have been inadmissible in a separate trial of the indictments pertaining to the girl. The defendant further postulates that the prosecutor's unexpected remarks on the omission theory of manslaughter compounded the prejudice. We disagree. We noted in *Commonwealth v. Denise Gallison*, 383 Mass. 659, 671-672 (1981), that the defendant bears the burden to show that prejudice will result from failure to sever. Here, the defendant was acquitted of the assault and battery charges regarding Edward, Jr. Although we do not evaluate the potential for prejudice from hindsight, the fact of his acquittal negates the defendant's claim of cumulation of evidence. Our conclusion, *supra*, that the prosecutor's argument created no improper surprise confutes the claim of prejudice from that direction. Finally, the evidence of the abusive treatment of the boy was properly admissible to show a common course of conduct and lack of inadvertence in the death of Jennifer. *Commonwealth v. Denise Gallison, supra* at 672-673. See generally *Commonwealth v. Chalifoux*, 362 Mass. 811, 815-816 (1973).

*Judgment affirmed.*

---

[10] The severance question was raised, without success, in two pretrial motions, first in Middlesex and then in the Superior Court in Bristol County.