COMMONWEALTH *vs.* JOHN L. EPPICH
(and a companion case against the same defendant).

Middlesex.    February 6, 1961. — May 1, 1961.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Breaking and Entering.  Intent.  Possession of Burglarious Implements. Evidence,* Of consciousness of guilt, Photograph, Order of evidence.

Certain circumstantial evidence at a criminal trial, coupled with evidence of false statements made by the defendant after the crime, warranted

Commonwealth *v.* Eppich.

convictions of attempting to break and enter a store in the night time with intent to commit larceny and of possessing burglarious implements. [491–493]

Proof that the defendant in a criminal case attempted to enter a store by force in the night time warranted an inference that he did so with intent to commit larceny. [493]

No error appeared in a criminal case in admitting in evidence a properly verified photograph showing gouges in the wooden under edge of an overhead door into the building which was involved in a charge against the defendant of attempting to break and enter in the night time with intent to commit larceny. [493–494]

No abuse of discretion appeared at a criminal trial in the admission as exhibits of certain implements found at the scene of the crime although evidence connecting the defendant with the implements was not introduced until later in the trial. [494–495]

Two INDICTMENTS found and returned on January 3, 1960.

The cases were tried in the Superior Court before *Swift,* J.

*Chester Shatz,* for the defendant.

*Neil Colicchio,* Assistant District Attorney, (*Robert M. Sriberg,* Assistant District Attorney with him,) for the Commonwealth.

KIRK, J. The defendant was found guilty by a jury on two indictments. One charged that the defendant on November 28, 1959, attempted to break and enter a building in Waltham in the night time with intent to commit larceny; the other charged him with possession of burglarious implements. By order of the judge the trial was held subject to G. L. c. 278, §§ 33A–33G, as amended through St. 1955, c. 352, § 1. The defendant rested at the close of the Commonwealth's case, and presented motions for directed verdicts which were denied.

The cases are here upon appeals accompanied by four assignments of error based upon exceptions taken at the trial and by a summary of the record and a transcript of the evidence.

For clarity of presentation of the issues we shall deal first with the third and fourth assignments of error which relate to the denial of the motions for directed verdicts. As grounds of error the defendant states that there was no evidence that the alleged attempt occurred in the night

time and no evidence of any intent on the part of the de-
fendant to commit larceny, and no evidence to warrant
verdicts of guilty.

We must detail the evidence. Shortly after 3 P.M. on
Saturday, November 28, 1959, one Lietch, manager of the
retail division of the Farm Bureau Association, Lexing-
ton Street, Waltham, secured the building, set the ADT
alarm and then left. It was raining, and continued to rain
until 9:30 P.M. It did not rain after that hour. About
11:30 P.M. two police officers in response to a radio call
proceeded to the Farm Bureau building in their cruiser and
arrived within a minute or less. There were no vehicles
in the vicinity. An overhead door at the northeast corner
of the building was found opened about eighteen inches.
They raised it and went inside but found no one in the
building. The building was otherwise secure except that
the electric or electronic connection with the ADT box had
been broken inside the door. A sledge hammer and a
length of pipe were on the ground in front of the door. On
the ledge or platform in front of the door were a pickax
head, a jimmy or ripping bar, and a wrecking bar. Within
a few minutes, also in response to radio, a third officer ar-
rived, who also checked the building and then proceeded to
cruise the streets of the area. About midnight he came
upon two men, the defendant and one Keyes, walking on
the black top sidewalk at the lower end of Valley View
Road, at a point about five hundred yards from the scene
of the alleged crime. The most direct route to this point
from the Farm Bureau building was by way of a paved
road from the rear of the building which extended to a dirt
road which ran through a wooded area, a stand of trees and
high grass. The officer stopped the two men for identifica-
tion. They had none, except that Keyes had a card with
his name on it. The footwear of the men was wet, their
"pant legs — the pant cuffs" were wet, there was mud
around the soles of their shoes, there appeared to be grass
seed clinging to Keyes's shoes. The defendant's shoes
were old and shabby, the uppers slimy and wet. The de-

fendant, who had known Keyes since 1938, said they had met by chance in a Boston cafe at 7 P.M. where they met two women with whom they sat in a booth near the Washington Street entrance and had drinks until 11 P.M. when the women drove them to Valley View Road where they said they lived, and let them out before they got to the house because they wanted first to see if anyone was home. One of the women returned and said that someone was at home and that they could not come in the house but that they might meet later at Wilson's Diner in Waltham where the defendant and Keyes were then proceeding. The defendant told the police the women entered a house a few houses down the road and he pointed down Valley View Road. He said the car was a '56 Oldsmobile. The two men toured the street in the cruiser but were unable to point out the house or the car. They did not know the last names of the women. They were then arrested.

There was testimony by two waitresses and a bartender, who had worked in that part of the cafe where the defendant and Keyes said they had been on the evening of the crime, that business was very slow that evening and that they had not seen either man on that day. The witnesses had been interviewed by police on Sunday, the day following the break.

Certain items of clothing, including a pair of brown cotton gloves found on the defendant and material from the cuffs of his trousers, and scrapings from his shoes and from the floor of the Farm Bureau building had been given to the State police chemist for analysis and comparison with the implements found at the scene.

The testimony of the State police chemist in substance was as follows: There were five specific fragments or chips of paint, each about the size of a pencil dot, found on the defendant's clothing which were compared with the paint on the implements. Under twenty-four power and forty power microscopic examinations it was determined that a fragment of gray paint found on the defendant's brown cotton glove was of the same color as and similar in

texture (i.e. in surface characteristics — gloss, dullness, wrinkles, smoothness, roughness) to the gray paint on exhibit No. 21 (the ripping bar); a fragment of greenish gray paint from the sole of the defendant's shoe was the same in color as and similar in texture to the foreign[1] greenish gray paint on exhibit No. 21; a fragment of black paint from the defendant's right trouser cuff was the same in color as and similar in microscopic appearance to the black paint on exhibit No. 20 (the wrecking bar); a gray paint chip from the defendant's right trouser cuff was the same in color as and similar in microscopic appearance to the gray paint on exhibit No. 21; a greenish gray chip from the defendant's right trouser cuff was the same in color as and similar in microscopic appearance to the foreign greenish gray paint on exhibit No. 21. He also testified that a piece of wood adhering to the end of the wrecking bar (exhibit No. 20) had two layers of paint, red and green, which were the same in color as and similar in microscopic appearance to the paints on a piece of wood removed from the overhead door for the purposes of analysis and comparison. The amount of material available limited the methods of examination and analysis which could be employed. Considering what he had to work with, the test was complete. He could not say for sure that the paints came from the exhibits.

There was evidence that the ADT system was tested at 2 A.M. on the day after the crime, and that when activated "a distinct buzzing noise . . . could be heard in the area inside the northeast door and up to where the box was . . . not a ring — just a buzz."

Obviously the evidence is circumstantial. As this court said recently in *Commonwealth* v. *Smith, ante,* 180, 183, "The principles governing such evidence are so familiar that they need not be restated, and we shall be guided by them. See *Commonwealth* v. *Webster,* 5 Cush. 295, 319;

---

[1] The original paint on the ripping bar (exhibit No. 21) was black and gray. Other paints were smeared on the ripping bar and were referred to by the expert as "foreign" paints.

*Commonwealth* v. *Russ,* 232 Mass. 58, 68; *Commonwealth* v. *O'Brien,* 305 Mass. 393, 400–401; *Commonwealth* v. *Shea,* 324 Mass. 710, 713–714.''

There was a case for the jury. The defendant and Keyes were found walking five hundred yards from the scene of the crime approximately one half hour after it allegedly occurred. The explanation of their presence in the neighborhood could be found to be false. The statement as to their whereabouts preceding and at the time the crime was committed could also be found to be false. False statements, especially when coupled with other evidence tending to incriminate him, could be considered as showing a consciousness of guilt on the part of the defendant of the crime with which he is charged. *Commonwealth* v. *Barber,* 261 Mass. 281, 288. *Commonwealth* v. *Derby,* 263 Mass. 39, 46–47. *Commonwealth* v. *Leland,* 311 Mass. 447, 456. *Commonwealth* v. *Curry,* 341 Mass. 50, 55. The wet condition of the defendant's footwear and trousers, and of Keyes's, could be found quite inconsistent with the narrative of having been in a cafe and in a motor vehicle, and walking for a short distance on hard top pavement since they had met at 7 P.M. On the other hand, it could be found consistent with having walked through wet brush and grass. The fact that the police officer cruising the roads in the area did not come upon them until one half hour after the alleged break, and then came upon them at a point in the road not far from the wooded grassy area to which direct access was had by a dirt road leading from the rear of the Farm Bureau building, could give rise to the inference that they had emerged from the wooded area. The testimony of the State police chemist that five distinct particles of paint found on the defendant's clothing corresponded physically to paint found on two implements at the scene of the break, together with the other evidence, could be the basis of an inference that the defendant had had them in his possession, and that exhibit No. 20 (the wrecking bar) had been used to force open the overhead door, leaving the gouges in its lower edge and the piece of wood

adhering to exhibit No. 20. The jury could further find that the breaking of the contact of the ADT system produced a buzzing sound which prompted them to flee, and almost simultaneously resulted in the radio order to the police at 11:30 p.m. to proceed to the scene. That the attempted break took place in the night time was thus inferable by the jury on the evidence.

The defendant says that the requisite element of specific intent to commit larceny has not been proved. It is generally accepted that such an intent is rarely susceptible of direct proof and must usually be inferred from all the facts and circumstances disclosed by the evidence. As was said in *Commonwealth* v. *Ronchetti,* 333 Mass. 78, 81, "A finding of intent usually is based upon what reasonably is to be inferred from conduct. When a person, by the use of force, enters a dwelling house in the middle of the night it may ordinarily be presumed, in the absence of evidence to the contrary, that his intent is to steal." We think this principle applies with at least equal force when the structure broken into is a building or store.

We are of the opinion that the jury could fairly say "that the circumstances taken together . . . [were] of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion, and producing in effect a reasonable and moral certainty, that the accused, and no one else, committed the offence charged." *Commonwealth* v. *Webster,* 5 Cush. 295, 319. The motions for directed verdicts were rightly denied.

We next consider the assignments of error on questions of evidence.

The first assignment of error relates to the admission in evidence as an exhibit of a photograph taken by the witness, a police lieutenant, on the Monday morning following the alleged crime, showing two deep gouges in the wood of the under edge of the overhead door of the premises. The objection was a general objection. Apart from the general rule that such an objection cannot prevail if the exhibit was admissible for any purpose (*Commonwealth* v. *Gia-*

*comazza,* 311 Mass. 456, 468, *Commonwealth* v. *Connolly,* 308 Mass. 481, 493) there was no error. The witness had already testified to his own observations as to the condition of the door; he had taken the photograph himself; there was no suggestion of any change in the physical condition of the door from the time of the arrival of the first person at the scene. Verification of the photograph was implicit in the officer's testimony, and a preliminary finding to that effect was implicit in the judge's ruling. See *Howe* v. *Boston,* 311 Mass. 278, 281–282. Its admission was clearly right.

The second assignment of error relates to the admission in evidence of the implements found at the scene and which had been marked for identification early in the trial. They were offered as exhibits after the State police chemist had taken the stand and after the continuity of custody from the time of their discovery had been established. The ground of objection was that there was "no connection to . . . the defendant." There was no error in admitting the evidence at that time. The order of proof rests largely in the discretion of the judge. *Commonwealth* v. *Johnson,* 188 Mass. 382, 384. *Commonwealth* v. *Tucker,* 189 Mass. 457, 467. *Commonwealth* v. *Coyne,* 228 Mass. 269, 270. As was said in the *Tucker* case, "Evidence must go in by piecemeal, and evidence having a tendency to prove a proposition is not inadmissible simply because it does not wholly prove the proposition. It is enough if in connection with other evidence it helps a little." The implements were admissible to show the means whereby the substantive crime had been committed. When he made his ruling the judge could reasonably expect that the district attorney, having presented evidence as to the means by which the crime was committed, would next proceed to present evidence that the defendant committed it. In his discretionary supervision of the order of the trial, it was for the judge to decide, when asked, if the implements should then be admitted subject to the defendant's right to move later that they be withdrawn if not connected with the defendant;

or to defer a ruling on their admissibility until evidence was introduced connecting the implements with the defendant. While the latter course is usually preferable as affording better protection to the defendant from possible prejudice, and might well have been followed, no harm in any event was done because evidence tending to connect the defendant with the exhibits was in fact produced.

*Judgments affirmed.*