COMMONWEALTH vs. CAROL A. MICHAUD
(and a companion case[1]).

Worcester. March 8, 1982. — October 1, 1982.

Present: HALE, C.J., GRANT & PERRETTA, JJ.

*Homicide. Wanton or Reckless Conduct. Pleading, Criminal,* Indictment. *Practice, Criminal,* Amendment.

An indictment charging involuntary manslaughter in essentially the form provided by G. L. c. 277, § 79, which sufficiently alleged a criminal offense, was not open to dismissal. [472]

At a trial of indictments for involuntary manslaughter charging that the defendants "did neglect *or* refuse" to provide their deceased child with sufficient food and drink, there was no error in allowing the amendment of the disjunctive "or" to the conjunctive "and" so as to conform the indictments to the wording of the form set out in G. L. c. 277, § 79, where the amendment neither prejudiced the defendants nor changed the substance of the crime charged. [472-474]

At the trial of indictments for involuntary manslaughter charging the defendants with neglect in the death of their baby, medical testimony and post-mortem photographs of the child's body provided sufficient evidence to warrant the denial of the defendants' motions for required findings of not guilty. [474-480] PERRETTA, J., dissenting.

INDICTMENTS found and returned in the Superior Court Department on October 10, 1980.

The cases were tried before *Rutledge,* J.

*Robert I. Warner* for Norman R. Michaud.

*Milton H. Raphaelson* for Carol A. Michaud.

*William E. Loughlin,* Assistant District Attorney, for the Commonwealth.

HALE, C.J. The defendants (Carol and Norman) were convicted by a jury in the Superior Court of involuntary manslaughter on amended indictments which charged, fol-

---

[1] Against Norman R. Michaud.

lowing a form in G. L. c. 277, § 79, that the defendants, "being under the legal duty and being of sufficient ability to provide Rita Michaud who was [their] daughter with sufficient food and drink for her sustenance and maintenance did neglect and refuse so to do; by reason whereof said Rita Michaud, being unable to provide sufficient food and drink for herself, became and was mortally sick and died." They were both sentenced to three years' probation.

The defendants assign as error (1) the denial of their respective motions to dismiss the indictments, as they did not "allege elements necessary to a charge of the crime of manslaughter"; (2) the allowance of the Commonwealth's motions to amend the indictments so that the words "neglect or refuse" as appearing therein would read "neglect and refuse"; and (3) the denial of their respective motions for required findings of not guilty.

1. The wording of the indictments in this case, as stated above, faithfully followed the form provided by G. L. c. 277, § 79, and, because the terms of that statute are sufficient to allege a criminal offense, an indictment following that form is not open to dismissal. Compare *Commonwealth v. Benjamin*, 358 Mass. 672, 675-676 (1971); *Commonwealth v. McClaine*, 367 Mass. 559, 560 (1975). The language in the forms set out in § 79, and in particular the form followed in this case, does not create or define a new or different crime of manslaughter. That language is merely a form by which the common law crime of manslaughter may properly be charged. See *Commonwealth v. Hall*, 322 Mass. 523, 529-530 (1948).

2. The indictments, as returned by the grand jury, charged, as noted above, that the defendants, having the duty to provide the deceased child "with sufficient food and drink . . . did neglect *or* refuse so to do" (emphasis supplied). Upon the Commonwealth's motion, the judge allowed the amendment of the disjunctive "or" to the conjunctive "and" so that the indictments would conform to the wording of the form set out in G. L. c. 277, § 79, which they otherwise closely tracked. Rule 4(d) of the Massachusetts Rules of Criminal

Procedure, 378 Mass. 849-850 (1979), provides that "a judge may allow amendment of the form of a complaint or indictment if such amendment would not prejudice the defendant . . . ." That rule replaced G. L. c. 277, § 35A, which was repealed by St. 1979, c. 344, § 35, and which contained language to the same effect as the part of rule 4(d) quoted above. The defendants conceded before the trial judge that the Commonwealth's burden was increased by this change and that it did not harm them. Likewise, they have not claimed on appeal that they were prejudiced in any way by the change, but they do contend that the change was one of substance and thus that they are not required to show prejudice. *Commonwealth* v. *Snow*, 269 Mass. 598, 603, 606, 609-610 (1930).

The test to determine whether an amendment is one of form rather than substance is "whether judgment of conviction or acquittal on the indictment as drawn would be a bar to a new indictment in the form in which it stood after the amendment." *Snow, supra* at 609. *Commonwealth* v. *Binkiewicz*, 342 Mass. 740, 748 (1961). *Commonwealth* v. *Baker*, 10 Mass. App. Ct. 852, 852-853 (1980). In this case, if one of the defendants had been acquitted of "neglecting *or* refusing" to provide nourishment for the child, that defendant could not be successfully prosecuted later for "neglecting *and* refusing" to provide such nourishment, as the prior acquittal would necessarily imply that the defendant had been put in jeopardy on both elements but found guilty of neither.

Furthermore, the defendants' argument that the amendment materially altered the function of the grand jury (see *Snow, supra* at 606; *Commonwealth* v. *Gallo*, 2 Mass. App. Ct. 636, 639 [1974]) is without merit. The crime charged in the present indictments was manslaughter. The words "neglect" and "refuse," whether employed disjunctively or conjunctively, are nothing more than specifications of the manner by which the crime was alleged to have been committed. In the words of *Commonwealth* v. *DiStasio*, 294 Mass. 273, 278 (1936), "The amendment did not change

the substance of the crime charged, but restricted the Commonwealth in its proof, to the advantage of the defendant[s], in much the same way as might have been done by specifications." There was no error in the allowance of the amendment.

3. The defendants both argue that the evidence was insufficient to warrant a finding of guilty of involuntary manslaughter and that it was error to deny their motions for required findings of not guilty when filed at the conclusion of the Commonwealth's case and when renewed at the close of all the evidence. Mass.R.Crim.P. 25, 378 Mass. 896 (1979).

The evidence at the close of the Commonwealth's case, taken in the light most favorable to the Commonwealth, can be briefly summarized as follows: Carol Michaud gave birth to Rita on June 29, 1980. Carol's pregnancy was without complications, and at birth the baby was healthy and weighed seven pounds, six ounces (3,350 grams). Carol breast fed the baby in the hospital. The nurses' notes in the hospital record show that shortly after birth the infant was feeding but was sleepy, and that the next morning the baby nursed very well, but that that afternoon she was sleepy and "so didn't nurse as well." There were no other notes as to feeding. The mother and baby were discharged from the hospital on July 1, 1980, the baby then weighing six pounds, thirteen ounces (3,100 grams). As testified to by Carol's obstetrician, this loss of weight was commensurate with the ten percent weight loss that most babies experience in the first few days of life. The baby was not seen alive by a physician after it left the hospital.

On July 24, 1980, at 9:43 A.M. the Blackstone police department got a call from Carol, who asked for help as her baby had stopped breathing. A police officer and rescue squad were dispatched, and the officer was the first to arrive. He was met by Carol, who directed him to the master bedroom. As he entered the bedroom he saw Norman giving artificial respiration to the baby. The officer noticed a small exchange of air in the baby, but, as she then stopped

breathing, he employed mouth to mouth resuscitation procedures. A few minutes later an emergency medical technician arrived, who continued the resuscitative efforts, and shortly after that the rescue squad arrived and transferred the baby to the Fogarty Memorial Hospital in North Smithfield, Rhode Island. Although cardiopulmonary resuscitation was given to the baby during the entire short ride to the hospital, the initial assessment by Dr. Mead, the emergency room physician, was that there was nothing that could be done medically to save the baby. The baby arrived in the emergency room with no pulse or respiratory functions, cold and stiff with rigor mortis. Nevertheless, life saving emergency techniques were employed by the hospital staff. Those efforts were without result, and the baby was pronounced dead at 10:12 A.M. The emergency room physician testified that the baby appeared to be undernourished. All of the nurses commented that "this child certainly looks very thin."

An autopsy was performed by the chief medical examiner of the State of Rhode Island, Dr. William Q. Sturner. Photographs of the body were taken before the autopsy was performed, and five of them were introduced in evidence. The pictures show a baby whose ribs and backbone were clearly visible and protruding and whose eyes had sunken in their sockets. Dr. Sturner's initial visual observations were that the baby was thin and malnourished. There were no physical abnormalities, nor were there any injuries or bruises. The child's diaper was soiled with feces and a moisture consistent with urine. The autopsy revealed no abnormalities of internal organs or of the gastrointestinal tract which could provide an organic or physiological basis for the malnourishment of the child (i.e., there was no inability on the part of the child to absorb food). The baby's stomach was empty, but a yellow mucous and soft fecal material were found in the baby's intestinal tract and distal colon. Dr. Sturner stated that the baby's condition was the result of malnourishment, which he defined as the lack of adequate or appropriate or sufficient amounts of material to sustain

normal growth and development. On the basis of his autopsy, which included tests for toxic and infectious agents in the baby's body and complete microscopic studies of the internal organs of the infant, the physical characteristics which were mentioned above, and the fact that the baby weighed, at death, approximately six pounds (2,738.8 grams), or one pound, six ounces less than she weighed at birth, Dr. Sturner opined the cause of death to be electrolyte imbalance due to malnutrition and dehydration as a result of starvation. He ruled out as a cause of death the "sudden infant death syndrome," or so called "crib death."

Carol and Norman had four other children living with them at the time of the incident. There was a twelve year old daughter from a previous marriage of Carol's and three younger sons from this marriage. Norman was a disabled veteran who spent his days at home caring for the children. His statements to the police were that he cared for the four older children while Carol cared for the baby and that he never saw anything wrong with the baby. He further stated to the police that Carol was breast feeding the baby without any other nourishment and that he had told Carol to take the baby to the pediatrician when she told him that the baby was not eating properly.

Carol stated to the police that she breast fed the baby and that she had breast fed her last three children. She would feed the baby six or seven times a day for one-half hour at each feeding. One of her breasts became sore, and, after consulting a doctor she purchased a breast pump. She stated that the baby cut down feeding the last week, so she would pump her breasts and feed the baby the remaining milk later. This would be between three and one-half and eight ounces per feeding. Carol told a police officer that she thought the baby had been getting heavier.

The day before the baby died, Carol drove Norman to a Veterans' Administration hospital for treatment, and they took the baby with them. They did not seek an examination or treatment for the baby at this time. Other than Carol, Norman and the children, the only person who appears to

have seen the baby after she left the hospital was a babysitter. She saw the baby the day she came home, and the baby looked healthy to her then. She saw the baby again for a few minutes on the Sunday before she died and also on July 23, 1980. At both those times the baby looked paler than when she had come home from the hospital. These observations were very brief, and she never saw the baby undressed.

At the preliminary hearings on motions, held immediately before the trial commenced, the district attorney indicated that in proving the charge of involuntary manslaughter the Commonwealth must establish that the conduct of the defendants was wanton and reckless, as stated in *Commonwealth* v. *Welansky*, 316 Mass. 383 (1944). The validity of that position was not questioned by defense counsel, and the judge gave his final instructions to the jury along those lines without objection by the defendants.

The law in this area is well settled. As stated in *Commonwealth* v. *Gallison*, 383 Mass. 659, 665 (1981), quoting *Welansky, supra* at 399, "The essence of wanton or reckless conduct is intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another." And *Welansky* recognized that "[t]he standard of wanton or reckless conduct is at once subjective and objective . . . . To constitute wanton or reckless conduct, as distinguished from mere negligence, grave danger to others must have been apparent, and the defendant must have chosen to run the risk rather than alter his conduct so as to avoid the act or omission which caused the harm. If the grave danger was in fact realized by the defendant, his subsequent voluntary act or omission which caused the harm amounts to wanton or reckless conduct, no matter whether the ordinary man would have realized the gravity of the danger or not. But even if a particular defendant is so stupid [or] so heedless . . . that in fact he did not realize the grave danger, he cannot escape the imputation of wanton or reckless conduct in his dangerous act or

omission, if an ordinary normal man under the same circumstances would have realized the gravity of the danger. A man may be reckless within the meaning of the law although he himself thought he was careful." *Welansky, supra,* at 398-399.

As far as the evidence before the jury is concerned, there was no direct evidence that the defendants starved the baby. But given that the cause of death could have been found to be starvation and dehydration, it was open to the jury to find that the defendants, the baby's parents, who by their own admissions were the constant caretakers of the child, neglected and refused to provide adequate food and liquid for the infant when it should have been obvious to them that the child was starving. The fact that there were no eyewitnesses to the parents' neglect to provide nourishment for their child does not preclude the jury from finding the parents criminally liable. Compare *Gallison, supra* at 667-668. Also, the concession by the Commonwealth's expert, Dr. Sturner, that the quality of a mother's milk would affect a baby's intake of nourishment would be a matter for the jury's consideration in determining the strength of the doctor's testimony, but it would not preclude a guilty verdict. We note that although the quality of the mother's milk could have had an effect on the nutritional needs of the child, the jury could well have been satisfied that had the child received regular feedings of mother's milk, she would not have been in the dehydrated condition which, as Dr. Sturner testified, resulted in an electrolyte imbalance which caused the death. Death by dehydration, the jury could have found, would not have occurred even if the mother's milk had no nutrients whatsoever, so long as she was feeding the child regularly. As to the quantity received by the child, we have here a mother who had nursed three other children and was thus experienced in the process and who stated that she had nursed this baby six or seven times a day. One might posit that the baby was sucking but receiving no milk at these feedings, but Carol's statement to the police was that only in the last week, when the weather was hot

and the baby began to cut down her feedings, would her breasts "fill up", which would require her to pump them. It was thus inferable that when she put the baby to her breast she knew whether or not the baby was taking milk. Furthermore, Carol stated that when her breasts would swell and she would pump them that she would get three and one-half to eight ounces of milk from them, and then feed the baby later with this milk. This testimony of feedings of from three and one half to eight.ounces of milk six or seven times a day, was totally inconsistent with the child's condition as described by Drs. Mead and Sturner.[2] Dr. Mead stated that the child had no subcutaneous tissue which indicated to him that the child was undernourished. Dr. Sturner described the appearance of the child's body as thin and malnourished, "the rib markings were very prominent. In other words, one could see the outline of the ribs because of the lack of subcutaneous tissue present in the chest area . . . [in the normal infant] they cannot be seen at all . . . . The area of the cheeks showed no puffiness or subcutaneous fat to be present there. They are sunken, as were the eye sockets . . . ." The doctors' observations were corroborated by post-mortem photographs of the child's body which were received in evidence and shown to the jury immediately before Dr. Sturner testified as to his observations. Dr. Sturner further testified that the baby could not have died of starvation, malnutrition, and dehydration had she ingested the nourishment Carol said she did. Thus, the jury could have regarded as incredible the defendants' statements to the police giving their version of the events (compare *Commonwealth v. Torrealba*, 316 Mass. 24, 30 [1944]; *Commonwealth v. Eppich*, 342 Mass. 487, 491-492 [1961]; *Commonwealth v. Swartz*, 343 Mass. 709, 711-713 [1962]; *Commonwealth v. Smith*, 368 Mass. 126, 128-129 [1975]), and it was open to the jury, on the evidence, to conclude beyond a reasonable

---

[2] In summarizing the doctors' testimony on this point, we have omitted their references to appearances attributed to post-mortem changes in the body.

doubt (*Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 [1979]) that these parents, having the duty to care for their baby, in callous disregard of the obvious emaciated condition of the baby, neglected and refused properly to feed and care for her, that their omissions were wanton and reckless, and by reason of those omissions the child died.

The judge did not err when he denied the defendants' motions for required findings of not guilty.

*Judgments affirmed.*

PERRETTA, J. (dissenting). I cannot agree that, when the Commonwealth rested its case, it had presented evidence sufficient to withstand the defendants' motions brought under Mass.R.Crim.P. 25(a), 378 Mass. 896 (1979). *Commonwealth* v. *Kelley*, 370 Mass. 147, 149-150 (1976). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979).

The charge set out in each of the identical indictments against the defendants bears repeating. Those indictments as amended charge that the defendants were of sufficient ability to provide their infant, Rita, "with sufficient food and drink for her sustenance and maintenance," that they "did neglect and refuse so to do," and that Rita, "being unable to provide sufficient food and drink for herself," died. Assuming without deciding that these charges also embrace a failure and refusal to seek medical attention or an alternative food source for Rita, but see *Commonwealth* v. *Grasso*, 375 Mass. 138, 139-140 (1978), and *Commonwealth* v. *Hobbs*, 385 Mass. 863, 869-870 (1982), I would conclude that the evidence does not permit a finding beyond a reasonable doubt that Carol and Norman's inaction in light of Rita's condition created a "substantial and unjustifiable risk" of her death. *Commonwealth* v. *Godin*, 374 Mass. 120, 130 (1977).

The Commonwealth was required to prove far more than a mistake in judgment or a high degree of negligence. Wanton and reckless conduct "involves conscious creation of a

substantial and unjustifiable risk." *Commonwealth* v. *Godin,*
374 Mass. 130, citing the Model Penal Code § 2.02(c) (Pro-
posed Official Draft 1962) ("A person acts recklessly with
respect to a material element of an offense when he con-
sciously disregards a substantial and unjustifiable risk that
the material element exists or will result from his conduct.
The risk must be of such a nature and degree that, consider-
ing the nature and purpose of the actor's conduct and the
circumstances known to him, its disregard involves a gross
deviation from the standard of conduct that a law-abiding
person would observe in the actor's situation"). Cf. Restate-
ment (Second) of Torts § 500, and comments a and b
(1965).

To sustain its burden of proving beyond a reasonable
doubt that Carol and Norman had acted wantonly and reck-
lessly, the Commonwealth put in evidence the following:
(1) Carol and Norman's statements to the police; (2) Dr.
Sturner's opinion that if Carol had fed Rita in the manner
described by her to Officer Mace,[1] Rita would not have died
from "an electrolyte imbalance due to malnutrition and
dehydration as a result of starvation"; and (3) Rita's physi-
cal appearance at the time of her death.

1. *Carol and Norman's Statements to the Police.*

The jury, of course, would not be required to accept as
true Carol's and Norman's statements to the police. How-
ever, a disbelief of their statements would not constitute
substantive evidence to be evaluated in considering whether
the Commonwealth had met its burden of proof. A disbe-
lief of their statements provides neither affirmative evidence
from which a jury could find that the contrary fact is true,
see *Commonwealth* v. *Marino,* 343 Mass. 725, 728 (1962),

---

[1] Carol told Officer Mace that she fed the baby six to seven times a day,
fifteen minutes on each of her breasts at each feeding, and that when the
baby cut down on her feedings during the last week, she would use a breast
pump, although not that often, and bottle feed Rita with that milk later.
On one occasion, Carol was able to pump eight ounces of milk from her
breasts, but usually the amount was "three to three and half ounces of
both breasts combined."

nor an evidentiary basis from which a jury could find that Carol and Norman had a consciousness of guilt. A fact finder's mere disbelief of a defendant's consistent, exculpatory statements, either extra-judicial or testimonial, does not constitute evidence of a consciousness of guilt. Consciousness of guilt is shown by independent evidence of the defendant's conduct which is inconsistent with his belief in his innocence. See *United States* v. *McConney*, 329 F.2d 467, 470 (2d Cir. 1964). See generally 1A, 2 Wigmore, Evidence § 173 and §§ 273-291 (3d ed. 1940). In the cases cited by the majority (*Commonwealth* v. *Torrealba*, 316 Mass. 24, 30 [1944]; *Commonwealth* v. *Eppich*, 342 Mass. 487, 491-492 [1961]; *Commonwealth* v. *Swartz*, 343 Mass. 709, 711-713 [1962]; *Commonwealth* v. *Smith*, 368 Mass. 126, 128-129 [1975]), the Commonwealth had presented independent evidence, which if accepted, would reasonably lead to the conclusion that the statements were false.

In my view, the only substantive value of their statements is found in their use as a factual basis for Dr. Sturner's opinion.

2. *Dr. Sturner's Opinion.*

I would hold that Dr. Sturner's opinion that Rita would not have died of "malnutrition, dehydration, starvation" had Carol breast fed Rita six or seven times a day, thirty minutes each feeding, see note 1, *supra*, is entitled to no weight because he assumed critical facts not in evidence in reaching his opinion. See *State Bd. of Retirement* v. *Contributory Retirement Appeal Bd.*, 342 Mass. 58, 65-66 (1961); *Sweeney's Case*, 3 Mass. App. Ct. 284, 286 (1975). Cf. *Mac-Kay* v. *Ratner*, 353 Mass. 563, 566-567 (1968).

Dr. Sturner assumed that Carol's milk was of proper "quality," a term he and counsel used to signify that Carol's milk was of nutritional value. He also testified that the "quality" of a mother's milk could have an effect on the nutritional needs of a breast-fed child. The jury could refuse to accept his testimony on this point but that refusal would not provide a basis for concluding that the "quality" of a mother's milk does not have any effect on the child's nutritional needs. *Commonwealth* v. *Marino*, 343 Mass. at

728. Moreover, such a conclusion would be, in my opinion, beyond the scope of the ordinary experience of the fact finder. See *Civitarese* v. *Gorney*, 358 Mass. 652, 656 (1971); *Commonwealth* v. *Harris*, 1 Mass. App. Ct. 265, 268, *S.C.*, 364 Mass. 236 (1973).

Proceeding on the assumption that Carol's milk was of proper "quality," Dr. Sturner next assumed that Rita was ingesting Carol's milk for "full feedings" six or seven times a day, except for the week of her death. He also testified that it does not follow that a baby is ingesting milk simply because he or she is at the mother's breast, that it is "a difficult situation," that while some mothers are able to know whether their baby is ingesting, others do not, that it depends upon the individual mother, that he did not know Carol, that whether a baby was in fact ingesting would be an important factor in any consideration of malnutrition, and that a loss of even a small amount of fluid could be critical in the process of dehydration.

In my view there is a critical distinction between an opinion given in response to a hypothetical question from which important facts are omitted and an opinion based upon significant assumptions not in evidence. Where facts are omitted from the hypothetical question, it is the question which is flawed but capable of cure by opposing counsel on cross-examination of the expert. See *Commonwealth* v. *Burke*, 376 Mass. 539, 541 (1978) ("The omitted facts could have been presented to the witness in a hypothetical question asked in cross-examination"). Where, however, the opinion rests on facts not in evidence, the weakness is in the answer and not the question. And where those assumptions are important to the opinion, as Dr. Sturner conceded on cross-examination, the opinion is entitled to no weight. *State Bd. of Retirement* v. *Contributory Retirement Appeal Bd.*, 342 Mass. at 65-66. Cf. *Commonwealth* v. *Burke*, 376 Mass. at 541. Compare *Commonwealth* v. *Rembiszewski*, 363 Mass. 311, 319-320 (1973). There is no adequate basis in the evidence for Dr. Sturner's assumption that Carol's

milk was of proper "quality" or nutritional value.[2] While the Commonwealth offered evidence to show that Rita could digest any food that she might ingest, there is no evidence to support the hypothesis put to Dr. Sturner that Rita had taken full feedings six or seven times a day except during the week of her death.[3] Nor is there any basis for inferring that Carol knew whether Rita was ingesting during her feedings. The fact that Carol had breast-fed her three other children has no probative force without some evidence concerning the similarity, or lack of it, between any of those three experiences and the present one. Cf. *Denton* v. *Park Hotel, Inc.*, 343 Mass. 524, 527-528 (1962); *Elwell* v. *DelTorchio*, 349 Mass. 766 (1965). Any inference that could be drawn from the fact that Carol used a breast pump and therefore knew that Rita was not taking milk is of no value. Carol stated to Officer Mace that she used a breast pump during the last week because Rita had cut down on her feedings. See note 1, *supra*. Moreover, Dr. Sturner's opinion was based upon the fact that Rita had cut down.

Although Dr. Sturner testified only that Rita's death was caused by an electrolyte imbalance due to malnutrition and dehydration as a result of starvation, the majority would allow the jury to conclude that "[d]eath by dehydration . . . would not have occurred even if the mother's milk had no nutrients whatsoever, so long as she was feeding the child regularly." I would hold that whether Rita would have died

---

[2] On the afternoon of Rita's death, Carol was given Miranda warnings and questioned by Officer Mace, whose inquiries had been prepared for him by Dr. Sturner. Carol was not questioned about her own physical condition, she was not asked if she would take a physical examination, nor was she requested to make a sample of her milk available for analysis. Dr. Martino testified that Carol's *prenatal* examinations indicated that prior to delivery she had no particular problems. Her urine was tested for protein and glucose. He regarded Carol's pregnancy as one "without any complications." Carol's and Norman's statements to the police contain no information concerning the "quality" of Carol's milk.

[3] Dr. Sturner testified that in conducting the autopsy, he found no organic or physiological inability on the part of Rita to absorb food, and he found no congenital abnormality in Rita's face and mouth area.

from an electrolyte imbalance due to malnutrition and dehydration as a result of starvation had she been fed milk containing no nutrients whatsoever six or seven times a day from June 29, 1980, to July 24, 1980, is a matter requiring expert medical testimony. *Civitarese* v. *Gorney*, 358 Mass. at 656. *Commonwealth* v. *Harris*, 1 Mass. App. Ct. at 268. There is nothing in Dr. Sturner's opinion which supports the Commonwealth's claim that Carol and Norman acted wantonly and recklessly.

3. *Rita's Physical Appearance.*

The Commonwealth introduced evidence to show that Rita was discharged from the hospital within two days of her birth. During those two days, Rita lost nine ounces, and in the twenty-four days preceding her death, she lost thirteen ounces. She weighed approximately six pounds at the time of her death, and there was medical testimony as well as postdeath preautopsy photographs describing and depicting her physical appearance.

Rita's physical appearance would be probative of whether Carol and Norman knew or should have known that Rita was not receiving sufficient food. Moreover, the Commonwealth's position on appeal and the majority's statement that the evidence was sufficient to allow a jury to conclude that Carol and Norman "neglected and refused properly to feed *and care for*" Rita (emphasis added) prevent limiting consideration of Rita's appearance to the question whether Rita died because Carol and Norman failed and refused to provide her with sufficient amounts of Carol's milk. There is no medical testimony concerning whether a breast-feeding mother faced with feeding problems may simply provide her infant with an alternative food source without first obtaining medical advice as to what the infant can and should be fed. Additionally, the Commonwealth made no reference at trial, nor does it claim in its brief before us, that Carol and Norman merely could have purchased milk and fed it to Rita. Rather, the Commonwealth states "that they both knew . . . that the child was not being properly fed and still did nothing about it." At oral argument, the Com-

monwealth became more specific concerning the phrase "did nothing about it" and argued that Carol and Norman's failure to seek medical attention for Rita in light of her physical appearance constituted wanton and reckless conduct. Accordingly, if the Commonwealth has a theory of criminal liability other than that Carol and Norman failed to provide Rita with sufficient amounts of Carol's milk, I would limit that theory to a failure to seek medical attention for Rita in light of her appearance.[4]

The Commonwealth offered no evidence to show that Carol's milk was of nutritional value or that, even if it wasn't, Rita would not have died of an electrolyte imbalance caused by malnutrition or dehydration if she had been fed regularly. While it seems obvious that Rita was able to, and in fact did, ingest some amounts of her mother's milk during the twenty-six days of her life, it does not follow, as Dr. Sturner testified in respect to breast-feeding infants in general, that Rita was able and willing to ingest sufficient food had it been provided for her. Rita died before the date of her first scheduled examination by a pediatrician. Carol told Officer Mace that Rita cut down on her feedings during the last week and that she, Carol, thought Rita had been getting heavier. While Carol's statements need not be accepted, there is no evidence to show that Rita's weight loss was a process of steady deterioration rather than a sudden event over a short time span. Dr. Sturner testified that a loss of even a small amount of fluid could be critical in the process of dehydration. There is no evidence whether Rita's condition and appearance at the time of her death was consistent with a process of deterioration and inconsistent with a rapid weight loss. In light of this state of the evidence, I view Rita's physical appearance at the time of her death as an in-

---

[4] Because I would conclude that the evidence is insufficient to support convictions based on a failure to seek medical attention, it is unnecessary to consider whether that failure constitutes a material variance from the charge set out in the indictments or, if not, whether the defendants suffered any prejudice. See *Commonwealth* v. *Grasso*, 375 Mass. at 139-140; *Commonwealth* v. *Hobbs*, 385 Mass. at 869-870.

sufficient basis for an inference either that Carol and Norman knew that they were not giving Rita a proper amount of her mother's milk or that Carol and Norman knew that Rita was in need of medical attention. See *Commonwealth v. Rosenberg*, 379 Mass. 334, 339-344 (1979). Compare *Commonwealth v. Godin*, 374 Mass. at 129-130; *Commonwealth v. Gallison*, 383 Mass. 659, 666 (1981). See also *State v. Rupp*, 586 P.2d 1302 (Ariz. App. 1978); *Eaglen v. State*, 249 Ind. 144 (1967); *Ahearn v. State*, 588 S.W.3d 327 (Tex. Crim. App. 1979). See generally Annot., Homicide by Withholding Necessities, 61 A.L.R.3d 1207, 1216-1224 (1975).

I would conclude that the Commonwealth failed to prove beyond a reasonable doubt that Carol and Norman were guilty of wanton and reckless conduct which resulted in Rita's death. I would reverse the defendants' convictions and remand the matter to the Superior Court for the entry of required findings of not guilty.